858 F.2d 905
 1988 A.M.C. 2829
 Frank R. HODES, Mildred Hodes
v.
S.N.C. ACHILLE LAURO ed ALTRI-GESTIONE Montonoave Achille
Lauro in Amministrazione Straordinaria
and
Commissario of the Flotta Achille Lauro in Amministrazione
Straordinaria
and
Chandris (Italy), Inc. (Two Cases).
Appeal of CHANDRIS, INC.
Appeal of LAURO LINES S.R.L.
 Nos. 88-5086, 88-5092.
 United States Court of Appeals,
Third Circuit.
 Argued June 22, 1988.
Decided Sept. 22, 1988.
 
 Daniel J. Dougherty (argued), Kirlin, Campbell & Keating, Caldwell, N.J., for appellant in No. 88-5086--Chandris, Inc.
 John R. Geraghty, Raymond A. Connell (argued), Healy & Baillie, Bergenfield, N.J., for appellant in No. 88-5092--Lauro Lines S.R.L.
 Stanley M. Brand, Abbe David Lowell, Sean Connelly (argued), Brand & Lowell, Washington, D.C., for appellees.
 Before GIBBONS, Chief Judge, and HIGGINBOTHAM, Circuit Judge, and ROTH, District Judge*.
 OPINION OF THE COURT
 ROTH, District Judge.
 Appellants, defendants below, contest the refusal of the district court to enforce a foreign forum selection clause contained in a cruise ship ticket, purchased by appellees, plaintiffs below, Mildred and Frank Hodes. Finding that the clause satisfies the "reasonable communicativeness" test this court set forth in Marek v. Marpan Two, Inc., 817 F.2d 242 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 155, 98 L.Ed.2d 110 (1987), and that its enforcement would not violate the principles the Supreme Court set forth in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), we hold the foreign forum selection clause should be enforced and thus reverse the decision of the lower court.
 I.
 This suit arises out of the terrorist hijacking of the Achille Lauro. The oceangoing Italian-flag vessel left Genoa, Italy, on October 3, 1985, scheduled to return to Genoa 11 days later. During its voyage, the Achille Lauro was to sail the Mediterranean Sea, calling at various ports. On October 7, 1985, off the coast of Egypt, Palestinian terrorists on board seized the vessel. They held the crew and some of the passengers hostage for three days and killed one passenger, an American citizen. Appellee Mildred Hodes was on board the ship during its capture; her husband, Frank, had disembarked to tour Egyptian sights.
 At the time of the hijacking, Achille Lauro ed Altri-Gestione M/N Achille Lauro s.n.c. ("ALA"), an Italian partnership, owned the Achille Lauro. ALA was one of a cluster of 19 Lauro entities, another being Societa di Fatto, Achille Lauro ed Altri Gestione Armatoriale Nava Noleggiate ("FAL"), also an Italian partnership. In February 1982, both ALA and FAL entered Italian reorganiation proceedings called Amministrazione Straordinaria On July 28, 1986, the entire cluster of Lauro entities, including ALA and FAL, were merged into one company, Lauro Lines s.r.l. ("Lauro Lines"). The merger was deemed retroactive to February, 1982.
 On September 14, 1984, ALA chartered the Achille Lauro for a three-year period to a joint venture composed of FAL and Chandris S.A., a Greek corporation. The joint venture operated the vessel as a cruise ship in the Mediterranean. ALA provided the joint venture with blank passenger ticket contracts which were sold worldwide by Chandris and FAL. Included among the markets for which Chandris was responsible was the United States. A little over ten percent of the joint venture's advertising budget was allocated for the United States and Canada. Chandris S.A. retained Chandris, Inc., a Delaware corporation with its principal place of business in New York City, to distribute American tickets. However, only 4.7 percent of the passengers who sailed on the Achille Lauro during the joint venture charter were U.S. citizens. On the October 3, 1985 cruise, 72 of the 728 passengers were Americans.
 The Hodeses became aware of the Achille Lauro cruises through a travel club, Club ABC Tours (the "Club"), of which they were members. The Club was operated by a travel agency, Crown Travel Service ("Crown"). Crown and the Club were in no way affiliated with ALA, FAL, or Chandris. Crown received information from Chandris, Inc. on the Achille Lauro cruises and negotiated with Chandris, Inc. a price for passage for its members on them. The Club then offered 16-day Mediterranean cruises to its members. The package included air travel from New York to Italy and return, 11 days on the Achille Lauro, leaving from and returning to Genoa, and then three days in a hotel on the Italian Riviera. The cost of the package was $1699 per person plus $60 Port Taxes. The cost of the cruise portion of the package was $825 per person in a two-bed outside cabin. The Club offered 15 different cruise dates to its members. The Hodeses signed up for the tour which left New York for Genoa on October 2, 1985, and sailed from Genoa on the Achille Lauro on October 3. In total, 57 members of the Club were booked for that cruise.
 The Club members paid the Club for the entire tour, the Hodeses paying $3,530.44 by check. The Club in turn remitted all ship passage fares for its members to Chandris, Inc. The Club then received from Chandris, Inc., the individual passenger tickets. Appellees allege they did not actually receive their tickets until "immediately before boarding the ship" in Genoa when a Club representative distributed them to the members. Nobody discussed the terms of the ticket with the Hodeses. Appellees "were totally unaware that [they] were waiving any legal rights simply by accepting the ticket."
 The cover of the passenger ticket contained the statement: "IMPORTANT: Passengers attention is drawn to the Shipowner's terms and conditions printed inside." Among the terms and conditions were 32 fine print articles on the back of the ticket. Article 31 stated: "All controversies that may arise directly or indirectly in connection with or in relation to this passage contract must be instituted before the judicial authority in Naples, the jurisdiction of any other authority being expressly renounced and waived." Article 32 provided for application of Italian law to any contractual disputes.
 As a result of the highjacking, appellees filed suit on April 7, 1986, claiming negligence, intentional infliction of emotional distress, breach of the maritime law obligation to provide safe passage, and breach of contract and implied warranties. In essence, appellees charged that the defendants failed to provide adequate security. Appellees sought $5,000,000 to compensate Mildred Hodes, $1,500,000 to compensate Frank Hodes, and $10,000,000 punitive damages for "each plaintiff against each defendant." Appellants moved for dismissal. In the event the action was dismissed, appellants agreed to waive any statutory or contractual limitations on time for bringing suit and to appear and defend in the correct Italian forum if suit was brought within 90 days of dismissal. Upon referral, the Magistrate recommended that the court dismiss the complaint on the basis, inter alia, of the forum selection clause. The district court did not adopt that recommendation but held that the suit could proceed because the forum selection clause was unenforceable.
 II.
 This court exercises appellate jurisdiction over decisions refusing to dismiss an action in order to enforce a forum selection clause on three grounds: (1) as interlocutory decisions under 28 U.S.C. Sec. 1292(a)(1); (2) as collaterally final orders under 28 U.S.C. Sec. 1291; and (3) under the All Writs Act, 28 U.S.C. Sec. 1651. In re Diaz Contracting, Inc., 817 F.2d 1047, 1048 (3d Cir.1987); General Eng'g Corp. v. Martin Marietta Alumina, Inc., 783 F.2d 352, 355-56 (3d Cir.1986); Coastal Steel Corp. v. Tilgham Wheelabrator, Ltd., 709 F.2d 190, 193-97 (3d Cir.), cert. denied, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983). See also Farmland Indus. v. Frazier-Parrott Commodities, 806 F.2d 848, 850-51 (8th Cir.1986). Contra Chasser v. Achille Lauro Lines, 844 F.2d 50 (2d Cir.1988);[1] Rohrer, Hibler & Replogle, Inc. v. Perkins, 728 F.2d 860, 862-64 (7th Cir.), cert. denied, 469 U.S. 890, 105 S.Ct. 265, 83 L.Ed.2d 201 (1984). Cf. Nascone v. Spudnuts, Inc., 735 F.2d 763 (3d Cir.1984) (no appellate jurisdiction over a motion to transfer venue within the federal system based on a forum selection clause). In the words of Justice Kennedy, the "federal judicial system has a strong interest in the correct resolution of these questions [regarding enforcement of forum selection clause], not only to spare litigants unnecessary costs but also to relieve courts of time consuming pretrial motions." Stewart Org., Inc. v. Ricoh Corp., --- U.S. ----, 108 S.Ct. 2239, 2250, 101 L.Ed.2d 22 (1988) (Kennedy, J., concurring).
 
 
 1
 We note that, despite appellees' argument to the contrary, the recent Supreme Court decision in Gulfstream Aerospace Corp. v. Mayacamas Corp., --- U.S. ----, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988), does not deprive this court of Sec. 1292(a)(1) jurisdiction. Gulfstream Aerospace did renounce the Enelow-Ettelson rule under which appellate courts automatically exercised jurisdiction over an order staying or refusing to stay proceedings issued in an action historically brought at law on the basis of a defense or counterclaim historically recognized by equity. Id. 108 S.Ct. at 1138-43. Enelow v. New York Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935); Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942). Nevertheless, the Supreme Court has also ruled that appellate jurisdiction persists over orders that have the effect of denying an injunction if the party seeking review can "show that the order will have a ' "serious, perhaps irreparable, consequence," and that the order can be "effectually challenged" only by immediate appeal.' " Stringfellow v. Concerned Neighbors In Action, 480 U.S. 370, 107 S.Ct. 1177, 1184 (1987) quoting Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 997, 67 L.Ed.2d 59 (1981) quoting Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 99 L.Ed. 233 (1955). See also Gulfstream Aerospace, 108 S.Ct. at 1142-43. We find that an order denying a motion to dismiss an action in order to enforce a forum selection clause has the effect of denying an injunction, resolves an important legal right, Coastal Steel, 709 F.2d at 195, and can be effectually challenged only by immediate appeal. Id. at 196-97. Accordingly, the demise of the Enelow-Ettleson rules does not preclude our review here under Sec. 1292(a)(1).
 
 III.
 
 2
 The question of whether terms and conditions of a cruise ship ticket were reasonably communicated to the passenger is a question of law for the court. The standard of review is plenary. Marek v. Marpan Two, Inc., 817 F.2d 242, 244-45 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 155, 98 L.Ed.2d 110 (1987).
 
 
 3
 Plenary also is our review of the district court's ultimate decision refusing to dismiss this action in order to enforce the forum selection clause. General Eng'g Corp. v. Martin Marietta Alumina, Inc., 783 F.2d 352, 359 (3d Cir.1986); In re Diaz Contracting, Inc., 817 F.2d 1047, 1048, 1053-55 (3d Cir.1987). Compare Mercury Coal & Coke v. Mannesmann Pipe & Steel, 696 F.2d 315, 318 (4th Cir.1982) (implicitly applying a de novo standard) and Bense v. Interstate Battery Sys. of Am., 683 F.2d 718, 722 (2d Cir.1982) (same) with Sun World Lines Ltd. v. March Shipping Corp., 801 F.2d 1066, 1068 n. 3 (8th Cir.1986) (adopting abuse of discretion standard of review) and Pelleport Investors v. Budco Quality Theatres, 741 F.2d 273, 280 n. 4 (9th Cir.1984) (same). Cf. Stewart Org. Inc. v. Ricoh Corp., --- U.S. ----, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (abuse of discretion standard when reviewing motion to transfer).
 
 IV.
 
 4
 A passenger ticket for an ocean voyage is a maritime contract. The Moses Taylor, 71 U.S. (4 Wall.) 411, 427, 18 L.Ed. 397 (1886). Accordingly, whether ticket conditions form part of the passenger's contract and the effect such conditions should be afforded are matters governed by the general maritime, not the local state, law. Despite the appellees having originally filed this action under diversity jurisdiction, 28 U.S.C. Sec. 1332(a), we are not constrained by Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to apply New Jersey law. Rather, "when a common law action is brought, whether in a state or in a federal court, to enforce a cause of action cognizable in admiralty, the substantive law to be applied is the same as would be applied by an admiralty court--that is, the general maritime law." Jansson v. Swedish Am. Line, 185 F.2d 212, 216 (1st Cir.1950) (Magruder, C.J.); Siegelman v. Cunard White Star, 221 F.2d 189, 192-93 (2d Cir.1955) (Harlan, J.).[2]
 
 V.
 
 5
 Our analysis of the applicable maritime law starts with Marek v. Marpan Two, Inc., 817 F.2d 242 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 155, 98 L.Ed.2d 110 (1987). At issue in Marek was whether the plaintiff was constrained by ticket provisions requiring notice of injury within six and institution of suit within 12 months of the date of injury. To decide this issue, the court entered into "a pair of distinct legal examinations":
 
 
 6
 One focal point is the adequacy of so-called "warning language," often found on the front cover of a cruise ticket, directing a passenger to read the particular terms inside the ticket. The other focal point is the ticket terms themselves, and concerns such physical characteristics as the location of the terms within the ticket, the size of the terms within the ticket, the size of the typeface in which they are printed, and the simplicity of the language they employ.
 
 
 7
 Id. at 245. The court then had to determine "whether, 'taken together, the various notices and provisions of this cruise ticket contract' suffice legally to give effect to the time limits it contains." Id. at 245, quoting Lubick v. Travel Servs., Inc., 573 F.Supp. 904, 907 (D.V.I.1983). To be legally sufficient, the ticket provisions had to meet a "practical 'standard of reasonable communicativeness.' " Marek, 817 F.2d at 245 quoting Lipton v. Nat'l Hellenic Am. Lines, 294 F.Supp. 308, 311 (E.D.N.Y.1968).
 
 
 8
 Applying the reasonable communicativeness test, we find the foreign forum selection clause was incorporated into the appellees' contract for passage.
 
 
 9
 The ticket itself consisted of one 11 inch by 17 inch page, to which were stapled seven ticket coupons. The page was folded into thirds, creating a cover and enfolding the coupons. On the back of the page appeared 32 contractual conditions.
 
 
 10
 As for its warning language, on the cover, directly beneath a schematic design of the cruise ship, appeared the statement:
 
 
 11
 IMPORTANT: Passengers attention is drawn to the Shipowner's terms and conditions printed inside.
 
 
 12
 The word "important" was printed in capital letters approximately 1/8 inch high; the rest of the statement was printed in upper and lower case letters, with the capitals again 1/8 inch high. The statement was clearly legible. Save for a similar admonition in Italian, and an identification of the carrier, this was the only wording on the ticket cover. Its starkness contributed to its readability. The unfolded back page, the top half in Italian, the bottom half in English, containing the 32 Articles, was headnoted in approximately 1/8 inch boldfaced letters, "TERMS AND CONDITIONS OF CONTRACT OF PASSAGE AND BAGGAGE." The headnote was absolutely clear. The Articles themselves were prefaced by a clause reading:
 
 
 13
 The Company undertakes to transport the passengers and their baggage at [sic] the following conditions which the passenger--owing to the mere fact of having booked and/or purchased the passage ticket--implicitly states to know and undertakes to fully comply with.
 
 
 14
 And they were followed by a clause reading:
 
 
 15
 The holder of this passage ticket, do[es] hereby declare to the effects [sic] and under provisions of art. 1341 and 1342 of the Italian Civil Code in force, that he is aware and adheres to all conditions and clauses set forth in this passage contract, and that he specifically approves clauses Nos. 1, 2, 3, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 23, 24, 25, 26, 27, 29, 30 and 32.
 
 
 16
 These clauses were in very small but readable print, less than 1/16 inch high. The ticket coupons themselves, in their lower lefthand corners, contained in print approximately 1/16 inch high the legible admonition: "This ticket is issued subject to the terms, conditions and regulations set out herein." Viewed in the aggregate, the ticket's warning language reasonably communicated to the Hodeses that their ticket formed a contract for passage, a contract incorporating the terms and conditions by which they were bound.
 
 
 17
 As for the foreign forum selection clause itself, Article 31 declared that "[a]ll controversies that may arise ... must be instituted before the judicial authority in Naples, the jurisdiction of any other authority being expressly renounced and waived...." Repeating our conclusion in Marek, although "the print is small, we have no trouble reading it, and the paragraph is certainly not 'so muddled or illegible as to be unenforceable.' " Marek, 817 F.2d at 246-47 quoting Gardner v. Greek Line, 388 F.Supp. 856, 858 (M.D.Pa.1975).
 
 
 18
 In sum, the foreign forum selection clause was reasonably communicated to the Hodeses. While our determination does contradict the ruling of the lower court and a similar bench ruling by the Southern District of New York, Klinghoffer v. Achille Lauro, 85 Civ. 9303 (S.D.N.Y. Oct. 21, 1987), appeal dismissed sub nom. Chasser v. Achille Lauro Lines, 844 F.2d 50 (2d Cir.1988), we believe a straightforward application of Marek compels such. Furthermore, our decision today is in line with precedent, although extended comparison of the varying minutiae of tickets is a somewhat casuistic pursuit and courts must approach each individual case "carefully to determine whether the particular type of notice was reasonable in that particular situation." Barbachym v. Costa Line, Inc., 713 F.2d 216, 220 (6th Cir.1983). Compare, DeNicola v. Cunard Line Ltd., 642 F.2d 5, 10-11 (1st Cir.1981); Carpenter v. Klosters Rederi, 604 F.2d 11, 12-13 (5th Cir.1979); Everett v. Carnival Cruise Lines, 677 F.Supp. 269, 271-72 (M.D.Pa.1987); Strauss ex rel. Strauss v. Norwegian Caribbean Lines, Inc., 613 F.Supp. 5, 8 (E.D.Pa.1984); Lipton v. Nat'l Hellenic Am. Lines, 294 F.Supp. 308, 309-10 (E.D.N.Y.1968) (all finding ticket provisions reasonably communicated); with Barbachym, 713 F.2d at 220; Silvestri v. Italia Societa Per Azioni Di Navigazione, 388 F.2d 11, 14 (2d Cir.1968); O'Connell v. Norwegian Caribbean Lines, Inc., 639 F.Supp. 846, 848-52 (N.D.Ill.1986); Raskin v. Compania d Vapores Realma, S.P., 521 F.Supp. 337, 341-42 (S.D.N.Y.1981) (all finding ticket provisions not reasonably communicated). See generally Annotation, Federal View as to Effect of Conditions Appearing on Back or Margin of Passenger's Ticket For Ocean Voyage, 5 A.L.R.Fed. 394 (1970).
 
 
 19
 Appellees would distinguish Marek not on the basis of the physical arrangement of the ticket but rather on the basis of the contract right at stake. Marek involved conditions regarding the timing of notice of injury and initiation of suit; this appeal involves forum selection. That distinction, appellees claim, is vital for two reasons. First, the injured passenger can avoid the time contraints by reading the ticket soon after injury and acting promptly; a forum selection clause cannot be similarly avoided. Second, because United States law, 46 U.S.C.App. Sec. 183b(a), prohibits conditions that require notice of injury sooner than within six months of injury or initiation of suit sooner than within one year of injury, it can be said conditions that meet that law are implicitly endorsed. Forum selection clauses enjoy no such sanction.
 
 
 20
 The Marek court did take these considerations into account, Marek, 817 F.2d 244, 247, as have other courts. See, e.g., Shankles v. Costa Armatori, S.P.A., 722 F.2d 861, 865-66 (1st Cir.1983). Nevertheless, those considerations were not essential to our finding. Regarding tacit statutory approval, that consideration goes to whether a specific condition should be enforced, not whether it was reasonably communicated. Regarding the possibility of a post-accident reading to avoid a condition, if that was made a prerequisite for enforcement, few conditions would survive but for time limitations. Courts have not hesitated to administer the reasonable communicativeness test to determine the validity of conditions apart from time limitations, conditions which could not be avoided by a post-accident reading. Hollander v. K-Lines Hellenic Cruises, S.A., 670 F.Supp. 563 (S.D.N.Y.1987) (foreign forum selection clause); Everett, supra (domestic forum selection clause); Wilkinson v. Carnival Cruise Lines, Inc., 645 F.Supp. 318 (S.D.Tex.1985) (same); Luby v. Carnival Cruise Lines, Inc., 1986 A.M.C. 2326 (D.Md.1985) (same); Cada v. Costa Line, Inc., 547 F.Supp. 85 (N.D.Ill.1982) (limitation of liability for lost baggage). Courts have also enforced time limitation clauses where passengers had surrendered their tickets on boarding and, therefore, could not avail themselves of a post-accident reading. See, e.g., Geller v. Holland-American Line, 298 F.2d 618, 619 (2d Cir.); cert. denied, 370 U.S. 909, 82 S.Ct. 1256, 8 L.Ed.2d 403, (1962); McQuillan v. "Italia" Societa Per Azione Di Navigazione, 386 F.Supp. 462, 464 (S.D.N.Y.1974), aff'd, 516 F.2d 896 (2d Cir.1975); Murray v. Cunard S.S. Co., 235 N.Y. 162, 166-67, 139 N.E. 226 (N.Y.1923) (Cardozo, J.). The essential inquiry remains whether the ticket reasonably communicated to the passenger the conditions of the contract of passage before the passenger boarded the vessel.
 
 
 21
 Appellees further argued that they did not receive their tickets until immediately before boarding the ship and, therefore, they had no effective opportunity to read the conditions of contract. Prior to the appellees boarding the Achille Lauro, the tickets had been held by Club ABC, the appellees' travel agent. In Marek, we found that a friend's "possession of the folder is sufficient to charge [plaintiff] with notice of its provisions." 817 F.2d at 247. This conclusion followed precedent in which possession by kith or kin of the plaintiff charged plaintiff with notice. Foster v. Cunard White Star, Ltd., 121 F.2d 12, 13 (2d Cir.1941) (brother); Rogers v. Furness, Withy & Co., 103 F.Supp. 314, 316-17 (W.D.N.Y.1951) (friend). The underlying question is whether someone has "acted in the capacity of an agent in acquiring the ticket for the plaintiff." DeCarlo v. Italian Line, 416 F.Supp. 1136, 1137 n. 2 (S.D.N.Y.1976). Club ABC considered itself the appellees' agent. Appendix at 27. In obtaining and safeguarding the Hodeses' tickets, the Club acted as their agents. The appellees have not suggested that Club ABC would have refused a request by them for the tickets had they made one. Accordingly, through their own and their agent's possession of the tickets, the appellees are charged with notice of the ticket provisions. Cf. Muratore v. The Scotia Prince, 845 F.2d 347, 352 (1st Cir.1988) (individual passenger not charged with notice of conditions contained in single group ticket issued to tour leader).
 
 VI.
 
 22
 Having found the foreign forum selection clause was incorporated into the Achille Lauro contract for passage, we must decide whether the clause should actually be enforced.[3]
 
 
 23
 In The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Supreme Court addressed the question of whether a London forum selection clause contained in a commercial towage contract should be enforced. Retreating from the traditional American antipathy toward forum selection clauses and acknowledging the growth of international commerce, the Court held that forum selection clauses were "prima facie valid," id. at 9-10, and that, as Justice Kennedy subsequently described the decision, "a valid forum selection clause [should be] given controlling weight in all but the most exceptional cases." Stewart Org., Inc. v. Ricoh Corp., --- U.S. ----, 108 S.Ct. 2239, 2250, 101 L.Ed.2d 22 (1988) (Kennedy, J., concurring). In an opinion by Chief Justice Burger, the Court remanded The Bremen for further proceedings to afford Zapata, the party opposing enforcement of the foreign forum selection clause, an "opportunity to carry its heavy burden of showing not only that the balance of convenience is strongly in favor of trial in Tampa ... but also that a London trial will be so manifestly and gravely inconvenient to Zapata that it will be effectively deprived of a meaningful day in court." 407 U.S. at 19, 92 S.Ct. at 1918. Alternatively, the Court allowed that a party might resist a foreign forum selection clause if it could clearly show that the contract resulted from "fraud, undue influence, or overweening bargaining power," id. at 12, 92 S.Ct. at 1914, or that "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Id. at 15, 92 S.Ct. at 1916.
 
 
 24
 Appellants would extend The Bremen to reach the Achille Lauro contract for passage and its Neapolitan forum selection clause. Appellees respond that a correct application of The Bremen works in their favor because (1) the Achille Lauro foreign forum selection clause was the result of overweening bargaining power, (2) its enforcement would contravene strong public policy, and (3) Neapolitan litigation would effectively deprive the appellees of a meaningful day in court. We analyze, and reject, those three arguments in turn.
 
 
 25
 The Bremen Court did take into consideration that the London forum selection clause it studied was the result of "an arm's length negotiation by experienced and sophisticated businessmen," 407 U.S. at 12, 92 S.Ct. at 1914, and " 'not simply a form contract with boilerplate language that Zapata had no power to alter.' " Id. at n. 14 quoting 428 F.2d 888, 907 (lower court dissent). In contrast, the Hodeses had little bargaining power and some jurists have characterized contracts of passage as contracts of adhesion. See, e.g., Schwartz v. S.S. Nassau, 345 F.2d 465, 470-71 (2d Cir.) (Kaufman, J., dissenting), cert. denied, 382 U.S. 919, 86 S.Ct. 294, 15 L.Ed.2d 234 (1965); Siegelman v. Cunard White Star, 221 F.2d 189, 204-6 (2d Cir.1955) (Frank, J., dissenting). Nevertheless, while the appellants certainly enjoyed a superior bargaining position, they did not take unfair advantage of that position to "overween" the Hodeses. See Restatement (Second) of Conflict of Laws Sec. 80 (1971) (forum selection clause "will be disregarded if it is the result ... of the unfair use of unequal bargaining power" (emphasis added)). In the words of Professor Ellinghaus, "[j]ust because the contract I signed was proffered to me by Almighty Monopoly Incorporated does not mean that I may subsequently argue exemption from any or all obligation: at the very best, some element of deception or substantive unfairness must presumably be shown." Ellinghaus, In Defense of Unconscionability, 78 Yale L.J. 757, 766-67 (1969). See Hoffman v. Nat'l Equip. Rental, Ltd., 643 F.2d 987, 991 (4th Cir.1981) (that forum selection clause appeared in a "form contract used by a large corporation" did not per se render clause unenforceable).
 
 
 26
 The choice of Italian venue for disputes arising out of a cruise on an Italian vessel, departing from and returning to Italy, was a sensible and fair choice. Furbee v. Vantage Press, Inc., 464 F.2d 835, 837 (D.C.Cir.1972) (upholding New York forum selection clause where performance occurred in New York). Indeed, it was the most reasonable choice of venue, if a choice was to be made. And it was reasonable to choose a specific venue, given that the cruise attracted passengers from the world over and was scheduled to sail the high seas and call at several Mediterranean ports, exposing the appellants to many jurisdictions. The forum selection clause operated to dispel uncertainty as to where suit could be brought and assured the appellants they would not face global litigation. See, The Bremen, 407 U.S. at 13-14, 92 S.Ct. at 1914-15. Cf. D'Antuono v. CCH Computax Sys., Inc., 570 F.Supp. 708, 714-15 (D.R.I.1983) (a national business has a "legitimate stake in not being required to defend lawsuits in far-flung fora"); LFC Lessors, Inc. v. Pearson, 585 F.Supp. 1362, 1364 (D.Mass.1984) (same, noting use of consistent forum "will also promote uniformity of result").
 
 
 27
 For similar reasons it was appropriate to provide that Italian law govern the contract, see Article 32 of the Contract for Passage, a law best administered by Italian courts. Cent. Contracting Co. v. Maryland Casualty Co., 367 F.2d 341, 345 (3d Cir.1966) (upholding New York forum selection clause where New York law to be applied); Bryant Elec. Co. v. City of Fredericksburg, 762 F.2d 1192, 1197 (4th Cir.1985) (upholding Virginia state court forum selection clause where Virginia law to be applied).
 
 
 28
 We note this is not a case in which a consumer contracted to have a service rendered or buy a product in his/her home jurisdiction only to later learn of the existence of a forum selection clause. See Yoder v. Heinold Commodities, Inc., 630 F.Supp. 756 (E.D.Va.1986) (refusing to enforce forum selection clause contained in brokerage services contract), contra Deolalikar v. Murlas Commodities, Inc., 602 F.Supp. 12 (E.D.Pa.1984); Horning v. Sycom, 556 F.Supp. 819 (E.D.Ky.1983) (refusing to enforce forum selection clause contained in computer sales contract), contra D'Antuono, supra. Appellees here contracted for a service to be rendered abroad, the Mediterranean cruise, exposing themselves to foreign law and possibly venue. While they did not specifically bargain over this clause, they are "presumed to have received appropriate consideration, in the form of a lower price, for the venue selection clause." Intermountain Sys., Inc. v. Edsall Const. Co., 575 F.Supp. 1195, 1197 (D.Colo.1983); see also Cent. Contracting, 367 F.2d at 344. Having found the appellants exercised a reasoned choice in selecting Neapolitan venue, we will not scuttle that choice on the basis of disparate bargaining power. See Hollander v. K-Lines Hellenic Cruises, S.A., 670 F.Supp. 563 (S.D.N.Y.1987) (enforcing Greek forum selection clause contained in contract for passage against American plaintiffs injured on cruise starting and ending at Piraeus).[4]
 
 
 29
 Appellees next argue that the public policy perpetuated by the law of the forum, i.e., the public policy of American maritime law, precludes enforcement of the foreign forum selection clause, referring to Indussa Corp. v. S.S. Ranborg, 377 F.2d 200 (2d Cir.1968) (en banc). In Indussa, Judge Friendly refused to enforce a Norwegian forum selection clause, contained in bills of lading, against an American plaintiff. Unlike the instant litigation, Indussa involved the carriage of goods, not the passage of people, and thereby the statutory regime of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. Secs. 1300-15. Specifically, the Court sought to vindicate Sec. 3(8) of COGSA which forbids any "clause, covenant, or agreement in a contract of carriage ... lessening [the carrier's liability for negligence, fault, or dereliction of statutory duties] otherwise than as provided in this chapter." To enforce a foreign forum selection clause, according to Judge Friendly, would have the practical effect of lessening carrier liability "quite substantially" because an American plaintiff would be intimidated by the prospect of foreign litigation and might then pliantly accept "settlements lower than if cargo could sue in a convenient forum." Indussa, 377 F.2d at 203. The Supreme Court has cabined Indussa to its COGSA parameters. The Bremen, 407 U.S. at 10, n. 11, 92 S.Ct. at 1913, n. 11. See also Bense v. Interstate Battery Sys. or Am., 683 F.2d 718, 722 (2d Cir.1982).
 
 
 30
 Appellees might nonetheless construct an analogous argument on the basis of 46 U.S.C.App. Sec. 183c which forbids any "provision or limitation ... purporting, in the event of loss of life or bodily injury arising from the negligence or fault of the [ship] owner or his servants, to relieve such owner, master, or agent from liability, or from liability beyond any stipulated amount, for such loss or injury." Section 183c also forbids any provision or limitation purporting to "lessen, weaken, or avoid the right of any claimant to a trial by court of competent jurisdiction on the question of liability for such loss or injury, or the measure of damages therefor." But the provisions of Sec. 183c, like those of COGSA, are limited in their application to voyages that touch the United States. Id.; 46 U.S.C.App. Sec. 1300. The law, and its policy, go no further. American maritime law as declared by statute does not avail the appellees.
 
 
 31
 Alternatively, appellees refer to public policy promulgated judicially. The judiciary, especially before passage of Sec. 183c in 1936, has at times restricted, on public policy grounds, the ability of a carrier to limit its liability for negligent conduct. See, e.g., The Arabic, 50 F.2d 96, 99 (2d Cir.1931); The Oregon, 133 F. 609, 630 (9th Cir.1904); Moses v. Hamburg-American Packet Co., 88 F. 329, 331 (S.D.N.Y.1898), aff'd 92 F. 1021 (2d Cir.1899). Most of these decisions, however, anticipated not only the substance of Section 183c but also its jurisdictional scope--the decisions dealt with carriers sailing to or from the United States. Id. Reaching beyond those bounds, the Second Circuit, in a case involving time limitations and thereby anticipating the substance if not the jurisdictional scope of 46 U.S.C.App. Sec. 183b, applied American public policy to void a provision contained in a contract for voyage from Montreal to Liverpool. Oceanic Steam Nav. Co. v. Corcoran, 9 F.2d 724 (2d Cir.1925). See also Barndt v. Det Bergenske Dampskibsselskab, 28 F.Supp. 815 (S.D.N.Y.1938) (following Corcoran, applied American public policy to void a limitation of liability provision contained in a contract of passage for voyage from Bergen to Newcastle). The court acknowledged that the provision, requiring the passenger give notice of claim within three days of landing, was valid under the laws of England. Id. at 728. Nonetheless, the court, emphasizing the American passenger had bought her ticket in Boston, concluded that an "agreement made in this country, and which is contrary to public policy, no matter how solemnly it may have been made, is to that extent absolutely void and cannot be enforced." Id. at 733. That conclusion in and of itself we accept, arguendo, as correct. But the result of Corcoran, if not the "apex of unreason" the dissent characterized it, id. at 733 (Hough, J., dissenting), is unpersuasive. We simply do not believe American public policy reaches the provisions of a contract of passage for an entirely foreign voyage, even should the contract be entered into within the United States. Congress, in Sections 183b and 183c, delimited the reach of American public policy to contracts of passage for voyages that touch the United States; we refuse to supplement that Congressional choice with judicial embellishment.
 
 
 32
 Appellees protest that an Italian court might enforce provisions of the contract of passage that purport to limit the carrier's liability for passenger injury to $10,000[5] and completely absolve the carrier's liability for passenger injury arising out of acts of piracy.[6] Neither litigant has proferred an expert opinion on Italian law as to whether these clauses would actually be enforced. In any case, we adamantly refuse to wield the trump of American public policy. Cf. The Bremen, 407 U.S. at 9, 92 S.Ct. at 1913 ("We cannot have trade and commerce in world market and international waters exclusively on our terms, governed by our laws, and resolved in our courts"). American passengers simply do not carry American public policy on their backs wheresoever they may venture. We leave it for Italian law and Italian courts to allocate the liabilities of this Italian dispute.
 
 
 33
 In The Bremen, the Supreme Court similarly straitened American public policy. The Fifth Circuit had refused to enforce the London forum selection clause, expressing concern that an English court would accept clauses of the towage contract limiting the liability of the tower for its own negligence. The Bremen, 407 U.S. at 15, 92 S.Ct. at 1916. Enforcement thereof, the lower court found, would violate the Bisso doctrine, a judicially created American public policy against towage contracts exculpating the tower's negligent conduct. Id.; Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). To the contrary, the Supreme Court found that the lower court had overestimated American public policy. The Bremen, 407 U.S. at 15-16, 92 S.Ct. at 1916. In the opinion by Chief Justice Burger, the Court limited the reach of Bisso to contracts that would " 'significantly encourage negligent conduct within the boundaries of the United States.' " Id. at 16, 92 S.Ct. at 1916 quoting 428 F.2d 888, 908 (lower court dissent). In the present appeal, we too observe the legitimate boundaries of American public policy. To rule the forum selection clause unenforceable on policy grounds would be to revisit the "parochialism" and "provincialism" that the Supreme Court decried in The Bremen. Id. at 9, 12, 92 S.Ct. at 1912, 1914.
 
 
 34
 Finally, appellees argue that "trial in the contractual forum will be so gravely difficult and inconvenient that [they] will for all practical purposes be deprived of [their] day in court," the third Bremen standard. The Bremen, 407 U.S. at 18, 92 S.Ct. at 1917. Appellees assert that the financial, linguistic, and cultural difficulties posed by an Italian lawsuit would prove insurmountable. We find, however, that these considerations, being but the obvious concomitants of litigation abroad, do not satisfy the Bremen standard. That standard is satisfied in the first instance if a litigant can show that he/she would face blatant prejudice in the foreign forum. For example, courts have refused to enforce foreign forum selection clauses that would send American litigants to the Islamic revolutionary courts of Tehran. See, e.g., Continental Grain Export v. Ministry of War-Etka, 603 F.Supp. 724, 729 (S.D.N.Y.1984). Here, there has been no showing whatsoever that an Italian court would treat the appellees unfairly. American courts, in this regard, have not hesitated to relegate American litigants to Italian justice. See, e.g., Dukane Fabrics Int'l, Inc. v. The Hreljin, 600 F.Supp. 202, 204 (S.D.N.Y.1985) (enforcing Genovese forum selection clause); Galaxy Export v. The Hektor, 1983 A.M.C. 2637, 2641 (S.D.N.Y.1983) (same). Alternatively, the Bremen standard may be satisfied if a litigant can show that enforcement of the foreign forum selection clause would be severely impractical. For example, this court in Copperweld Steel Co. v. Demag-Mannesmann-Bohler, 578 F.2d 953 (3d Cir.1978), considered whether a German forum selection clause should be enforced. The suit involved an alleged defect in an industrial plant. Ruling against enforcement of the clause, the lower court found that the plant was located in and had been constructed in the United States and would have to be inspected during the course of the trial; that many of the witnesses and much of the documentation were located in the United States; and that almost all of the witnesses were English speaking. Id. at 965, n. 18. We affirmed. Id. at 965-66. In contrast, appellees' suit has few links to the United States but for their nationality and the fact that they bought their tickets here. On the other hand, Italy is where performance occurred and where appellants allegedly failed to provide adequate security. Italian will be the language of many, if not most, of the witnesses, members of the crew, or the local authorities. Overall, the practicalities of litigation weigh in favor of the Neapolitan forum. While it is far more convenient for the appellants to sue in Trenton rather than Naples, "this circumstance is not sufficient to justify allowing [appellees] to avoid the effect of the contract they entered into freely, providing for suit in the country where their cruise took place." Hollander, supra, 670 F.Supp. at 566. Finally, we observe that the appellants have stipulated to waive any statutory or contractual limitations on time of suit and to appear and defend in the correct Italian forum, provided the appellees bring suit within 90 days of dismissal. Appellees therefore have failed to demonstrate that Neapolitan litigation would result in their being deprived of a meaningful day in court.
 
 VII.
 
 35
 For the errors now assigned to the trial court, its decision not to enforce the foreign forum selection clause will be reversed and this suit remanded to that court with directions to dismiss the action brought by the Hodeses. Appellees may pursue their action in Italy.
 
 
 
 *
 Honorable Jane R. Roth, United States District Judge for the District of Delaware, sitting by designation
 
 
 [1]
 This suit was brought in the Southern District of New York by seven passengers and executrices of two other passengers involved in the hijacking of the Achille Lauro. The district court denied a motion to dismiss on the basis of the forum selection clause and the Court of Appeals held that denial of the motion was not appealable under the collateral order doctrine
 
 
 [2]
 Applying the general maritime choice of law rules to this litigation, we find American general maritime substantive law controls the issues before us today. First, while the terms and conditions of the ticket apparently provide for application of Italian law, the preliminary question of whether a specific condition is incorporated into a ticket contract putatively entered into in the United States by an American citizen is one for American law to decide. McQuillan v. "Italia" Societa per Azione di Navigazione, 386 F.Supp. 462, 467 n. 11 (S.D.N.Y.1974), aff'd 516 F.2d 896 (2d Cir.1975); Restatement (Second) of Conflict of Laws Sec. 187, Comment b (1971). To give effect to a choice of law provision "for the purpose of determining whether it and the other ticket conditions should be given effect obviously would be putting the barge before the tug." DeNicola v. Cunard Line Ltd., 642 F.2d 5, 7 n. 2 (1st Cir.1981). Second, the decision to dismiss this action in order to enforce a foreign forum selection clause, implicating as it does an American public policy interest that litigants should not be unfairly relegated to distant courts, is governed by American law. For example, the Supreme Court in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), applied American general maritime law to decide whether a foreign forum selection clause should be enforced, despite contractual provision for London adjudication and presumably English law. Id. at 13, n. 15, 92 S.Ct. at 1915, n. 15
 Neither party has argued that Italian law pertains to this question. See Fed.R.Civ.P. 44.1.
 
 
 [3]
 In cases involving time limitation clauses, inquiry into enforcement is usually brief because the provisions of 46 U.S.C.App. Sec. 183b can be straightforwardly applied. Because no statutory provisions govern foreign forum selection clauses, the question of enforcement here is more complex
 
 
 [4]
 Appellees rely on Consumers Power Co. v. Curtiss-Wright Corp., 780 F.2d 1093 (3d Cir.1988), to support their argument against enforcement of the forum selection clause. Consumers Powers is distinguishable. In it, there was "no evidence that Consumers Power ever received the brochure [containing the limitation of liability that the defendant sought to be enforced], much less that it read and consented to its contents." Id. at 1096-97. Here, appellees received a contract for passage that reasonably communicated its terms and conditions, among them the foreign forum selection clause
 
 
 [5]
 The contract of passage also refers to the applicability of the Athens Convention of 1974 which limits liability for personal injury to 700,000 francs (the "franc" being defined therein as a unit consisting of 65.5 milligrams of gold of millesimal fineness 900). Athens Convention of 1974, Arts. 7, 9, IMCO No. 75.03E (entered into force April 28, 1987), reprinted in 6 Benedict on Admiralty 2-9 (7th ed. 1988)
 
 
 [6]
 Whether the Achille Lauro hijacking constituted an act of piracy is a matter of controversy. See Franck & Senecal, Porfiry's Proposition: Legitimacy and Terrorism, 20 Vand. J. Transnat'l L. 195, 199 n. 8 (1987)