**Nettie EFFRON, Plaintiff,**

**v.**

**SUN LINE CRUISES, INC. and Sun Line Greece Special Shipping Co., Inc. Defendants.**

**No. 93 Civ. 0896 (MGC).**

United States District Court, S.D. New York.

July 22, 1994.

Phillips Cappiello Kalban Hofmann & Katz, P.C. by Paul T. Hofmann, New York City, for plaintiff.

Walker & Corso by Scott A. Walker, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

Plaintiff sues for injuries allegedly suffered on a South American cruise. The ship's owner moves to dismiss on the ground that the forum-selection clause in plaintiff's ticket requires that her claims be brought in Greece.

The tour operator who sold plaintiff her ticket moves for summary judgment on the ground that at all times it acted as agent for a disclosed principal. For the reasons discussed below, the motions are denied.

### Facts

The *Stella Solaris,* which sails under the Greek flag, is owned by defendant Sun Line Greece Special Shipping Co., Inc. ("Sun Line Greece"), a Greek corporation. The ship's home port is Piraeus, Greece, although it spends several months each year cruising in the Caribbean and off the coast of South America.

Defendant Sun Line Cruises, Inc. ("Sun Line Cruises") is a New York corporation that markets cruises aboard the *Stella Solaris* and two sister ships, the *Stella Oceanis* and *Stella Maris.* Sun Line Cruises markets trips on the three ships. This name appears on the promotional materials distributed by defendants. A division of Sun Line Cruises called Sun Line Tours arranges air travel and issues airline tickets for customers taking particular cruises.

Plaintiff Nettie Effron, a 74 year-old widow, is a resident of Florida. In February 1992, she was a passenger on the "Jewels of South America Cruise." She arranged her vacation through a Florida travel agent who dealt with Sun Line Cruises in New York. The trip included air travel from Miami to Manaus, Brazil on February 12, passage on the South American cruise of the *Stella Solaris* from February 12 to February 28, and air travel from Buenos Aires, Argentina to Miami on February 28. Plaintiff's airline tickets were provided by Sun Line Tours and listed Sun Line Cruises as the charterer. In arranging her trip, plaintiff had no contact with anyone in Greece.

Plaintiff's ticket, which contains the passage contract on which defendant Sun Line Greece relies, is reproduced in its actual size in the Appendix to this opinion. The ticket consists of three double-sided leaves, each approximately 4″ × 8½″. The Sun Line logo and the words "Sun Line Cruises" appear in large type on the face of the ticket. In much smaller type is an "important notice" which states:

Please read carefully the terms of this ticket beginning on page 1 and continuing through page 4. All these terms are an integral part of the contract between passengers and the Carrier. In accepting this contract, you agree to the terms. Attention is particularly drawn to the Carrier's right of exemption and limitation set forth in Clauses 12 and 13 (pages 3 and 4).

It is only on the very last line of the ticket that Sun Line Greece is identified as the "operator and carrier," i.e. the putative contracting party.

The forum-selection clause appears in clause 13 on page 4 of the ticket. It is printed in the same size type as the rest of the fine print. It reads as follows:

Notwithstanding anything to the contrary contained herein, any action against the Carrier must be brought only before the courts of Athens Greece to the jurisdiction of which the Passenger submits himself formally excluding the jurisdiction of all and other court or courts of any other country or countries which court or courts otherwise would have been competent to deal with such action.

Plaintiff states in an affidavit that she did not notice either the warning on the front of her ticket or the forum-selection clause itself. She also states that she was unaware that she was contracting with a Greek company and not the New York corporation with which she had dealt.

### Enforceability of the Forum–Selection Clause

Sun Line Greece's motion to dismiss is based on the language of the forum-selection clause. It relies on decisions enforcing forum-selection clauses in passenger tickets. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Hodes v. S.N.C. Achille Lauro ed Altri–Gestione,* 858 F.2d 905, 911 (3d Cir. 1988), *cert. dismissed,* 490 U.S. 1001, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989); *Hollander v. K–Lines Hellenic Cruises, S.A.,* 670 F.Supp. 563, 566 (S.D.N.Y.1987). All of these cases are distinguishable. To enforce the forum-selection clause in plaintiff's ticket

would be fundamentally unfair because doing so would effectively deprive her of her day in court.

Forum-selection clauses are "prima-facie valid." *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972). Nevertheless, "forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness." *Carnival Cruise Lines,* 499 U.S. at 595, 111 S.Ct. at 1528. When a party seeks to avoid application of a forum-selection clause, "it should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be gravely difficult and inconvenient and that he will for all practical purposes be deprived of his day in court." *The Bremen,* 407 U.S. at 18, 92 S.Ct. at 1917. Plaintiff has made such a showing.

If this action were dismissed, plaintiff would be required to travel to Greece to pursue her claim. Plaintiff has provided an affidavit stating that if required to sue in Greece, she will be unable to do so for the reasons that follow. She cannot afford to travel to Greece. She would be afraid to stay in a strange city where she does not know the language and customs. She is partially disabled and would have to hire someone to assist her physically. She does not know any Greek lawyers, and is ignorant of the Greek legal system. She cannot afford to hire a Greek interpreter. All of her witnesses live in the United States, and she cannot afford to pay for them to travel to Greece to testify. Plainly, given these circumstances it would be a "grave inconvenience" to require plaintiff to sue in Greece, and it is unreasonable to assume that she would be able to do so. For all practical purposes, enforcement of the forum-selection clause would deprive her of her day in court. *The Bremen,* 407 U.S. at 18, 92 S.Ct. at 1917.

Plaintiff's circumstances are significantly different from those of the plaintiffs in the cases on which defendants rely. In *Hodes,* the Third Circuit enforced a forum-selection clause requiring a passenger on the *Achille Lauro* to sue the ship's owners in Italy. The ship was hijacked off the coast of Egypt during an eleven-day cruise to and from Genoa, Italy. 858 F.2d at 912–16. In *Hollander,* the Court enforced a clause requiring a passenger injured on a cruise of the Greek Islands to sue in Greece. 670 F.Supp. at 565–66. In both *Hodes* and *Hollander,* the designated forum was foreseeable because the cruise took place, at least in part, in the country of the designated forum. In each instance, the plaintiffs had travelled to the forum country to begin their cruise. Here, neither plaintiff, nor the occurrence sued on, had any connection with Greece.

Similarly, the effect of enforcing the forum-selection clause in *Carnival* was significantly less onerous than doing so here would be. In *Carnival,* the Supreme Court upheld a clause that required a resident of the State of Washington, who had taken a cruise from Los Angeles to Mexico, to sue in Florida, the home state of the defendant. 499 U.S. at 590–95, 111 S.Ct. at 1525–28. The Court refused, however, to adopt a per se rule as to the validity of forum-selection clauses. "It bears emphasis that forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness." 499 U.S. at 595, 111 S.Ct. at 1528. It may be fair to require a citizen of one state to sue in another, but it is fundamentally unfair to require a citizen of Florida, who is injured on a cruise off the coast of South America, to travel to Greece to sue the Greek shipowner, who does extensive business in the United States.

### Agent and Disclosed Principal

Plaintiff's second claim alleges breach of contract against both defendants. The complaint alleges that plaintiff contracted with both defendants for safe passage and that both defendants breached that contract by failing to provide a safe vessel. Sun Line Cruises moves for summary judgment on the ground that at all times it acted as an agent for a disclosed principal. "When an agent makes a contract for a disclosed principal, it becomes neither a party to the contract nor liable for the performance of the contract." *Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 860 (2d Cir.1985).

■ Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the movant properly supports a summary judgment motion, the party opposing the motion must establish a genuine issue of material fact in order to preclude summary judgment. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). In deciding whether a genuine issue of fact exists, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir. 1993).

Whether Sun Line Cruises disclosed to plaintiff that it was acting on behalf of Sun Line Greece is a jury question. In support of its motion, Sun Line Cruises relies primarily on plaintiff's ticket, which states that it is a contract between passengers and "the Carrier." Sun Line Greece is identified as the Carrier only in small print at the bottom of page 4.

■ In opposing the motion, plaintiff has marshalled a variety of evidence suggesting that she was unaware that she was contracting only with Sun Line Greece. The brochure advertising the cruise was distributed by Sun Line Cruises, and only mentions in fine print on the last page that "transportation of passengers and baggage on the Stella Solaris is provided solely by Sun Line Greece ..." Plaintiff's airline ticket was delivered along with a letter from Sun Line Tours. Her airline ticket was purchased by Sun Line Cruises and the jacket it was delivered in bears the Sun Line Logo. Her credit card receipts show that while she was on the *Stella Solaris,* payments for food went to Sun Line Cruises. Based on this evidence, a jury could plausibly decide that Sun Line Cruise's status as agent was not adequately disclosed to plaintiff. A reasonable jury could find that plaintiff was led to believe that she had purchased steamship passage from a New York company. Accordingly, plaintiff has raised a genuine issue of fact about whether Sun Line Cruises disclosed to plaintiff that it was acting only as an agent for Sun Line Greece.

For the foregoing reasons, defendants' motions are denied.

SO ORDERED.

APPENDIX

## Passage ticket and contract

Sun Line Greece Special Shipping Co. Inc.

3 Iasonos St. - Piraeus 185 37 - Greece - tel. 452 34 17

STELLA SOLARIS - COUNTRY OF REGISTRY: GREECE

**IMPORTANT NOTICE - READ BEFORE ACCEPTING:**

Please read carefully the terms of this ticket beginning on page 1 and continuing through page 4. All these terms are an integral part of the contract between passengers and the Carrier. In accepting this contract, you agree to the terms. Attention is particularly drawn to the Carrier's right of exemption and limitation set forth in Clauses 12 and 13 (pages 3 and 4).

Sun Line Cruises

STELLA SOLARIS

# GENERAL CONDITIONS

THE CONTRACT TERMS AND CONDITIONS REFERRED IN THIS TICKET AND SET FORTH ON THIS AND THE FOLLOWING PAGES (1-2-3-4), TO WHICH PASSENGER EXPRESSLY AGREES AND WHICH ARE TO APPLY TO AND GOVERN THE RELATIONS WHATEVER THEY MAY BE BETWEEN PASSENGER AND THE CARRIER, MASTER, VESSEL, OWNER, OFFICERS, CREW AND AGENTS, IN EVERY CONTINGENCY WHATSOEVER AND WHERESOEVER OCCURRING AND EVEN IN THE EVENT OF OR DURING DEVIATION OR UNSEAWORTHINESS OF THE VESSEL AT THE INCEPTION OF THE VOYAGE OR SUBSEQUENTLY AS FOLLOWS: THE TERMS OF THIS PASSAGE CONTRACT SUPERSEDE ALL REPRESENTATIONS, PROMISES AND AGREEMENTS WHATSOEVER THAT MAY HAVE BEEN MADE OR MAY BE CLAIMED TO HAVE BEEN MADE, TO OR WITH THE PASSENGERS, OR HIS AGENT OR REPRESENTATIVE BY ANYONE ON BEHALF OF THE CARRIER.

**NOTICE.** The Passenger's attention is particularly directed to the terms and limitations of this contract.

1) a) Except when inconsistent with the context hereof, the word «Vessel» shall include the vessel named in this passage contract, any substituted vessel, any tender or craft owned or operated by the Carrier and used to embark or disembark passengers and/or baggage and any vessel or craft or other means of conveyance whatsoever owned, chartered operated or controlled by the «Carrier» shall, except in the provision against waiver of the terms hereof, include the vessel as defined herein, her owner, demise charterer and operator, and also any time charterer or person to the extent bound by this passage contract to the Passenger, whether acting as Carrier or bailee. and the Master, Officers and crew of the carrying vessel; the word «baggage» shall include all kinds of personal effects and property whatsoever of the Passengers whether or not remaining wholly or partly in the custody of the passenger and such as are ordinarily or usually carried by the passengers of like station making like journeys and whether taken on board before or during the voyage, but shall not include any articles such as described in Clause 11 (b) and 11 (c) hereof; the word «Passenger» shall include all the persons who use or are mentioned in the passage contract and their surviving spouse, executors, administrators, legal representatives, heirs, assigns, next of kin, dependents and personal representatives, the masculine pronoun including the feminine gender whenever applicable; the word «charges» shall include all fares, other expenses, costs, indemnities, damages and money obligations whatsoever payable by or chargeable to or for the account of Passenger or on baggage, regardless of whether sustained, incurred or paid by the Carrier in the first instance; the word «loss» or «damage» shall include death, injury and delay of the Passenger, loss, damage and delay of the baggage and any loss or damage whatsoever sustained or claimed by the Passenger, his or her surviving spouse, executors, administrators, legal representatives, heirs, assigns, next of kin, dependents and personal representatives; the word «forwarding» or «return» or other substituted transportation may include at Carrier's option transportation by rail, water, land or air or by two or more of such means and whether operated by the Carrier or by others or operated under another flag, and the words «government» and «authorities» shall include the United Nations and any similar international organization, and also persons having or exercising power, control or other functions of a governmental or military nature whether in the name of a sovereign state or or of a political subdivision thereof, whether de jure or de facto.

(b) This passage contract provides for transportation on the Vessel named above or on a substituted vessel, the name and the owner or chartered owner of which shall be designated herein when presented by the Passenger at or prior the embarkation. SUN LINE GREECE SPECIAL SHIPPING CO. Inc. assumes responsibility only for such stage or stages of such transportation as shall be performed by it as Carrier on a Vessel owned or chartered by demise to or operated by such Carrier. If the Vessel or any substituted Vessel is not owned by or chartered by demise to SUN LINE GREECE SPECIAL SHIPPING CO. Inc., this passage contract shall take effect as a contract with the owner or demise charterer thereof if other than SUN LINE GREECE SPECIAL SHIPPING CO. Inc. as the case may be, as principal, made through the agency of SUN LINE GREECE SPECIAL SHIPPING CO. Inc., which acts as agent only and shall be under no personal liability whatsoever in respect thereof

(c) If it shall be adjudged that any person or corporation other than the Owner or the demise charterer or the operator is liable to the Passenger, then all limitations of and exoneration from liability provided by law to vessel owners and or by the terms hereof shall be available to such person or corporation.

2) This passage contract is not tranferable. The Passenger shall not be entitled to transportation except on production and surrender of this passage contract or in case of its loss or theft, upon furnishing indemnity satisfactory to the Carrier against use or presentation of the lost or stolen passage contract. Passage money shall be deemed earned at the time of embarkation and the Carrier may retain it under all circumstances and in every possible happening or contingency. If there be an interruption, frustration or abandonment of the voyage at the port of embarkation or elsewhere, any forwarding or return of the Passenger and/or baggage, whether or not arranged or assisted by the Carrier, shall be at the sole risk and expense of the Passenger and/or the

Carrier shall be deemed the agent of the Passenger for such purpose and the Carrier shall be entitled to reasonable extra compensation for such service above the passage money and any expense incurred by the Carrier shall be deemed a lien against the baggage. If this passage contract is not used for the vessel and on the voyage named on the face hereof or is lost, stolen or mislaid, it shall be void, and the passage money shall be deemed earned and shall be retained by the Carrier in such event, except at the sole option of the Carrier, Carrier may make refund to the extent the accommodation may be disposed of to another, less all charges and expenses incurred by the Carrier. Any refunds or payments for which the Carrier may be liable for unused transportation; deposit for «on board» money, provisional or prepaid passage contracts or otherwise, to whomsoever paid and whether before or after the contract voyage, shall be made by the Carrier only in the currency of the country in which this passage contract was purchased, provided, however, that the Carrier, at its sole option, may make payment of the refund in the currency of any other country at the rate of exchange prevailing at the time payment is made. All charges involving payment of money shall be due and payable day by day immediately when they are incurred. The Passenger will pay all such charges in full and without any offset, counterclaim or deduction. All charges that may be due to the Carrier hereunder shall be paid at the option of the Carrier in United States currency and if with Carrier's permission, paid in the currency of a foreign country, then at Carrier's option at the current or official rate of exchange. The Carrier shall have a lien on the baggage and any other property of the Passenger for all charges whatsoever that may be incurred by or due from the Passenger or incurred by the Carrier with respect to the Passenger; and may enforce this lien by public or private sale in any manner and without notice. The proceeds of the sale shall be applied towards the settlement of the Carrier's charges, and the Carrier shall not be under any liability in consequence thereof, except to account for the balance, if any, of such proceeds. In any case this passage contract shall not be good for passage after one (1) year from date of issue hereof unless extended in writing by the Carrier and in accordance with its regulation existing when application for extension is made.

3) The Carrier at all times may refuse to transport or may land or reject a Passenger at any port, at Passenger's own risk and expense and cancel this passage contract, in the event of any illness, infirmity, injury, mental derangement, disorderly or vulgar conduct, or failure or refusal to observe or comply with any regulations which shall or may be established on board the Vessel for the general comfort or safety, or any conduct by or condition of a Passenger which in the opinion of the Carrier or Master renders or may render the Passenger unfit to proceed or remain on board, or is likely to endanger the health or safety of or cause annoyance or discomfort to other Passenger or others on board or if the Passenger may be, in the opinion of the Carrier or Master, inadmissible under the laws of the country of debarkation or because of the Passenger's tender years. If the Passenger be, or is believed to be, suffering from such physical or mental condition or is otherwise objectionable for any reasons mentioned, the Passenger agrees to submit to such restrictions on board the Vessel as in opinion of the Carrier or Master or other officer in charge may be necessary for the safety and comfort of the Passenger and/or other Passenger or persons aboard the vessel. The Carrier, Master or such other representative shall be the sole judge of such matters, and Passenger agrees to accept such judgment as final, and neither the Carrier nor the Master nor such representative shall be liable for mistake in judgment exercised in good faith. No person shall be entitled to repayment of any portion of the passage money or to any compensation or damages because of being so refused transportation or landed or left, except that if transportation is refused before any transportation is begun hereunder, the passage money will, upon, surrender hereof, be refunded in the amount for which the accomodation may be disposed of to another less all charges and expenses incurred by the Carrier. The acceptance of Passengers for passage shall not constitute a waiver by Carrier of any right to object thereafter to any conditions or conduct of Passenger which would have brought Passenger within any of the above clauses at time of acceptance for passage. In any case, any expense paid or incurred by the Carrier because of any of the aforesaid conditions, or because of the death of the Passenger, shall be for the account of the Passenger. If on board or elsewhere, at any point, any Pas-

senger delays or is detained because of any action of the authorities as to such Passenger, or for any reason not the fault of the Carrier, such Passenger and any Passenger remaining with such Passenger be travelling with a husband, parent or other guardian, then such husband, parent and or guardian, also shall be jointly and separately liable to the Carrier for any maintenance provided, and for all expenses of maintenance or other expenses borne, incurred, assumed voluntarily or otherwise by the Carrier for or on account of such Passenger or any Passenger remaining with such Passenger or arising out of such delay or detention, maintenance on board or elsewhere to be charged at the rate of $ 10.00 per day or such higher sum as the Carrier may fix, and children in the proportion of full fare paid Passengers carried beyond destination without fault of the Carrier may be required to pay at the above mentioned rates for any additional maintenance on board occasioned thereby and for extra transportation

4) Passenger assumes all responsibility for obtaining passports, visas, re-entry permits, and other documents including health and vaccination certificates which are or may be required by governmental or other authorities If the failure of Passenger to obtain any such document or otherwise comply with laws or regulations, delays or might delay or threaten the delay of the Vessel or might be deemed a violation of any rule, order or direction of any governmental or other authorities the Carrier shall have no further obligation to transport or furnish transportation to the Passenger and no refund shall be made except at the discretion of the Carrier. Sale of this passage contract and/or embarkation of the Passenger shall not be construed as a representation of guarantee by the Carrier that the Passenger so embarked will be admitted to the country of destination or to any other country at which the Vessel may call and the Carrier assumes no responsibility to the Passenger in the event that he is not admitted.

5) If the Passenger is permitted to stop-over at any regularly scheduled intermediate port of call, it will be for such period and on such terms as may be granted by the Carrier in advance, but in no event for a period exceeding three months from the date of stop-over. Passengers stopping over must bear their landing and embarking charges and all other expenses whatsoever in connection with such stop-over, and pay all government tax, fine or charges including those for which the Carrier may be liable or which may be incurred because of such stop-over. If a stop-over has been granted the Passenger must make arrangements for such further passage as may be available with the agent of the Carrier at the place of stop-over and submit this passage contract to such agent for endorsement at least twenty-four (24) hours before his intended embarkation from the port of stop-over. The Carrier does not obligate itself to provide subsequent transportation, not to reserve or provide accommodations on any particular vessel or sailing to a passenger who has stopped over, and subsequent passage, if any, will be furnished to the passenger only if and when accommodations are available. The Passenger will pay or receive, as the case may be, the difference in rate, if any, between those in effect during the period for which the passage contract was issued for use and those in effect when the passage contract is actually used, and like adjustment will be made if accommodation at the rate specified herein are not available and other accommodations are furnished to and occupied by the Passenger.

6) Passenger will pay all taxes, port charges embarkation or landing expenses, stamps, health fees, quarantine dues and charges, and in case of detention by reason of quarantine, order or requirements, no matter for what reason Passenger will bear all risks and expenses thereby incurred, if quarantined or detained on the Vessel or on shore at Vessel's expense. Passenger will pay daily to Carrier for maintenance at the rate of $ 10.00 per day or such higher sum as the Carrier may fix and children in the proportion of full fare paid, for every day of detention. Passenger agrees that Carrier shall have a lien upon all Passenger's baggage and all property of Passenger on the Vessel for such charges and or all other proper charges due to Carrier from Passenger, including but not limited to bar, laundry, excess baggage, telegrams and other items of such nature and, Carrier shall have the right to hold and to retain such baggage and property until such charges are paid, and if not paid within 60 days after demand, carrier may enforce this lien by public or private sale of such baggage and property without notice.

7) (a) Every Passenger paying full fare is allowed fifteen (15) cubic feet of baggage free of charge. Every Passenger paying less than full fare is allowed a proportionate amount of baggage free of charge. Every Passenger will pay at the current rate for every additional cubic foot of baggage above the amount allowed to such Passenger as indicated above, but such payment shall not increase the limit of value and of liability elsewhere provided in this passage contract. All baggages must be distinctly marked and labelled and must indicate whether or not it is required during the voyage and it must be delivered by the Passenger to the Carrier's servants upon the pier, not later than twenty-four (24) hours before scheduled sailing time.

The Carrier will not be liable for loss, damage or delay resulting from failure of Passenger to mark clearly each piece of baggage with his full name and address, together with the name of the Vessel, expected sailing date, cabin number and destination.

(b) Notwithstanding the provisions of this article and irrespective of offer of payment therefore, the Carrier reserves the right to limit the amount of baggage to be carried by each Passenger in excess of fifteen (15) cubic feet.

(c) The Passenger will not be liable to pay, nor entitled to receive, any general average contribution in respect of property taken with him on the Vessel

8) Animals and birds, subject to the provisions of Article 9 hereof, may be taken on board only upon and in accordance with the terms of the written order issued by the Carrier, and cannot be kept in the cabins, saloons or on the promenade decks, but must remain in the places provided on board the Vessel Any special food or services therefore shall be supplied by and at the expenses of the Passenger. The Passenger is responsible for any and every damage to things or third parties caused by the animals and birds he takes with him. The Carrier is not responsible for accidents, loss, illness or death of the Passenger's animals and birds which may take place during the voyage or during embarkation or disembarkation and the carcasses may be disposed of as the Master shall direct.

9) (a) Every Passenger is prohibited from carrying and must not carry or have on board any article whatsoever of an inflammable, explosive or damaging nature, and if, notwithstanding, a Passenger does carry any such articles, such Passenger will be liable for all damages to himself and any other person and to his, their, and/or the Carrier's property, that may be sustained in consequence Such article, if deemed dangerous by the Master or the Vessel, may be thrown overboard or destroyed at any time without liability. The Passenger agrees to be liable and indemnify the Carrier for all loss, damage or delay resulting from the Passenger bringing on board any article forbidden by, or which does not conform to the Customs, police or other regulations of any country or place where the Vessel may be in the course of her voyage. Passengers must not take firearms on board unless written permission has been obtained from the Carrier, and if that permission has been obtained, firearms must be deposited with the Master.

(b) Pursuant to the provisions of Title 46 U.S. Code, Section 882, the Passenger is notified that the Vessel carries one or more dangerous and hazardous articles or by law.

10) (a) In any situation whatsoever and wheresoever occurring and whether arising or anticipated before the commencement of or during the voyage or the embarkation of the Passenger, which in the judgment of the Carrier or the Master is likely to give rise to risks of capture, seizure, arrest, detention, injury, damage, delay, danger or disadvantage to any of the Passengers or other persons on board or to the Vessel or cargo or loss of the Vessel, or any part of her cargo or to make it unsafe, imprudent, unadvisable, or unlawful for any reason to commence or proceed on or continue the voyage or to enter, embark or land Passengers or load or discharge goods at any port or to give rise to delay or difficulty in arriving, embarking, landing, loading, or discharging at or leaving port for the usual or agreed or intended place of embarkation, loading, landing or discharging in such port, the Carrier or Master, before, during or after the commencement of the voyage or whether or not the Vessel is proceeding toward or entering or attempting to enter the port of embarking, loading, landing or discharging or reaching or attempting to reach the usual or intended place of embarking, loading or debarking or discharging therein may, without giving prior notice, substitute another vessel, abandon the voyage or proceed or return to or stop at any place and embark or land the Passenger and load or discharge baggage or cargo or any part thereof, and when the Passenger is landed and/or the baggage discharged, the Carrier shall be free from any further responsibility in respect to the Passenger and/or his baggage. The Carrier shall be entitled to reasonable extra compensation for any such services, above the agreed passage money and if in following the measures or action authorized herein, the length or duration of the voyage is increased, the Passenger shall pay proportionate additional fare The Carrier shall not be under any responsibility to embark the Passenger under the above circumstances and shall not be liable for failure to do so Any action taken by the Carrier pursuant to the provisions of this Article may be with or without notice to or consent of the Passenger.

(b) The Carrier and Master shall have liberty to comply with any orders, directions, regulations, recommendations, authorizations, requirements, requests or suggestions, including any such which may be given or effected pursuant to or by reason of any agreement or undertaking exacted from or considered advisable by the Carrier or Master, as to priorities, allocations, receipt, handling, loading, embarkation, stowage, manning, equipment, supplying, repairs, stoppages, delays, movements, anchorages, sailing, operation, management, navigation, courses, routes, voyages, arrivals, port of call, discharge, destination, examination, landing, delivery, storing, reshipment, transhipment, disposition or other act or omission whatsoever, whether or not relating to the vessel, the

Passengers, baggage or cargo, crew or other persons aboard howsoever, whensoever and wheresoever given at port of embarkation or elsewhere by the government of any nation or department thereof or by any person acting, purporting, appearing or seeming to act with the authority of such government or department, or by any committee or person having, purporting, appearing or seeming to have, under the terms of the war risk insurance on the Vessel, the right to do so or to approve the Voyage. The Carrier shall be entitled to receive extra compensation for any such services above the agreed passage money, and if in following the measures or action authorized herein, the length or duration of the voyage is increased, the Passenger shall pay proportionate additional fare. The ship may carry contraband and may sail armed or unarmed, with or without convoy and with or without lights.

(c) The scope of the voyage contemplated is the carriage of Passenger, mail and cargo or any of them, in the Carrier's general trade which for such or any other or incidental purposes may or may not include all usual, scheduled, customary, ordinary or advertised routes, ports and places, whether named in this passage contract or not, and other routes, places or procedures referred to herein.

(d) As often as and for any reason whatsoever the Carrier or Master may deem advisable, including but not limited to the loading or discharge of cargo, mail, baggage, personal property whatsoever, or the embarking or landing of passengers, crew, workmen or other persons whomsoever, or for the fueling, supplying or repair of the ship or care or safety of passengers, other persons, ship or cargo; regardless of whether such reason or action relates to the current or a prior, intermediate, subsequent or overlapping voyage, or to matters occurring, known or anticipated before or after embarking of passengers receipt of loading of baggage or cargo, and whether or not the voyage may have commenced or the passenger embarked, the ship, at any stage of the voyage and without notice to the passenger:

(1) may proceed under any conditions of sea and weather, may discontinue service between any ports, return to the loading port, depart from or change the intended route and proceed in any direction by any other routes whatsoever, proceed or return to or call at or stay or delay at any ports or places whatsoever in any rotation, sequence or order, backward or forward or otherwise, return to port or omit calling at any ports or places regardless of whether such routes ports or places or any of them may be within or in a direction contrary to or outside of or beyond the advertised scheduled, geographic, direct, customary, usual or ordinary route or itinerary, and

(2) may also, at any time or place whatsoever proceed under sail or in tow, adjust compasses, carry live-stock or dangerous goods, drydock, go on ways or to repair yard, shift berths or places in port, remain in port, lie on bottom or aground in berth, make trial trips or test, take fuel or stores at any place, lie at anchor or moorings, sail in or out of ports or elsewhere without pilots whether or not pilots are customary and available, proceed under tow, tow and assist vessels in any situation, or save or attempt to save life or property whether the property be that of the Carrier or others including the liberty to depart from her course to any extent for any such purposes.

(e) Anything done in accordance with this Article shall be deemed as authorized and within the intended contract voyage. The provisions of this Article are not to be restricted by any words of this passage contract, whether written, stamped, printed or incorporated herein.

11) (a) The fare for transportation under this passage contract is based partly upon the valuation of baggage provided herein. Unless a higher value shall be declared as herein after provided, the value of the baggage of a Passenger paying full fare shall be agreed and taken to be not more than $50.00. The agreed value of the baggage of a Passenger paying less than full fare shall be proportionately less, if the value of the Passenger's baggage exceeds the valuation above agreed to and is so declared in writing by the Passenger to the Carrier and written upon the passage contract before embarking and a charge of 1% on such excess value is paid to the Carrier, the value of such baggage shall be taken to be not more than the value so declared, if the passage contract is purchased at the pier immediately before sailing, any declaration of value by the Passenger as above described must be made in writing to the Purser within twelve (12) hours after embarking. The increased valuation will be effective only from the time when the payment is made by the Passenger. Any articles purchased by the Passenger or brought on board during the voyage, such as usually carried by Passengers of like station pursuing like journeys shall be treated as baggage and unless the value of such articles is declared by the Passenger and additional charges paid thereon as required by the Carrier, shall be included in the valuation provided in the second sentence of this clause, or such higher value as may have been declared by the Passenger as herein above provided. The valuation provided in the second sentence of this clause or such higher values as may have been declared by the Passenger to the Carrier as herein provided or the actual value, if it be less, shall constitute the measure of damage with respect to any loss or damage to or other claims in connection with the Passenger's baggage wheresoever occurring for which the Carrier may be liable. Any liability of the Carrier for partial loss or damage to the baggage of any Passenger shall be computed by taking that percentage of the valuation provided in the second sentence of this Article or of such higher values as may have been declared and paid for by the Passenger, or of the actual value, if it be less, obtained by dividing the value of the lost or damaged baggage by the value of the Passenger's entire baggage if it all had been delivered undamaged

(b) The Carrier shall not be liable in any capacity whatsoever for any loss or damage of money, jewellery, precious stones, securities and other valuables, and the articles mentioned in Section 4281 of the Revised Statutes of the U.S., howsoever and wheresoever occurring, which have not been delivered to and accepted by the Carrier for transportation under bill of lading or which have not been deposited with the Master or vessel's officers assigned to that duty for safekeeping and covered by a receipt issued by the Master or such officers. Unless a higher total value and a true description of the articles shall be declared in writing to the Master or such officers by a Passenger at the time of deposit of such articles, the value thereof shall be taken to be not more than $100.00 and any liability of the Carrier shall not exceed such sum or the actual value if it be less, any liability for partial loss or damage shall be computed pro rata on such valuation or on the actual total value if it be less. If the actual value of such articles exceeds $100.00 and is so declared by the Passenger and a charge of one per cent on such excess value paid to the Carrier, the total value of such articles shall be taken to be value so declared and any liability of the Carrier whatsoever shall not exceed such valuation. Any liability for partial loss or damage shall be computed pro rata on such basis or a less actual value if it be less. In no event shall the Carrier be liable for more than the damage actually sustained nor for any consequential or special damage and Carrier shall have the option of replacing any lost articles or effects and/or replacing or repairing any damaged article or effects

(c) The Carrier does not undertake hereunder to carry as baggage of Passenger, and is under no liability whatsoever for birds, animals, reptiles, fish, samples tools of trade, scientific instruments, household goods and furnishings, property of others, perishable goods, glassware, liquids, bric-à-brac, or any other articles whatsoever not necessary for the Passenger's use on the voyage covered hereby; and transportation thereof must be arranged for by the Passenger with the Carrier in writing.

(d) The fare for the transportation reserved herein is fixed with reference to circumstances existing at or before the issuance of this ticket. If the Carrier's rates for accommodations such as those reserved herein are increased, the passenger shall have the option of paying the additional fare or of cancelling this reservation. In the event of such cancellation all money theretofore paid by the passenger will be refunded. Notice of any rate increase will be mailed to the passenger at least 20 days before the Sailing Date stated herein and if the passenger wishes to cancel he must notify the Carrier within 10 days after the mailing of such notice

12) (a) The Carrier shall not be liable in any capacity for any claim whatsoever, nor for any illness, loss of life or bodily injury howsoever occurring, howsoever and wheresoever occurring arising from act of God, perils or accident of the sea or other waters and of navigation, causes beyond the Carrier's control, compliance with any direction whatsoever by any Government or by any person acting or purporting to act under the authority thereof, collision, stranding, jetteson or wreck, fire from any cause whatsoever or wheresoever occurring, on shore, on board or in craft, barratry of the Master or Crew or other servant's of the Carrier, enemies, pirates, robbers, theft, pilferage, arrest or restraint, capture, seizure or detention, interference of any sort, or any act of princes, rulers, government or people or any power, legal, process, epidemics, pestilence, wars, rebellions, hostilities, riots, strike lockouts, picketing, stoppage of labour or labour troubles of the Carrier's employees or others, shortage or lack of fuel, accumulation of cargo; explosion, bursting of boilers, steam breakage, accidents or derangements of shafting or machinery or appurtenances; fault or error in the management or navigation of the vessel, water, rain, spray, seawater, heat, sweat, warpage, smoke, frost, ice, earthquakes, floods, freshets, smel, taint, leakage of containers, breakage of goods containers or contents, drainage from cargo, fumigation, disinfectant, unseaworthiness latent or other defect in any part of the hull, boilers machinery or appurtenances of the Vessel even though existing at the time of shipment or embarkation, or at the beginning of the voyage, delay and, without limitation of the foregoing, any loss or damage or otherwise arising in any way whatsoever. Without prejudice to the foregoing the burden of proving negligence shall be on the party asserting it and it is agreed that there shall not be any presumption or inference of negligence because of the occurrence of facts or cir-

*Continued over leaf on page 4*

cumstances out of which any claim arises. Even though dangers or conditions, whether arising from war or otherwise, may exist or be anticipated when this passage ticket is issued or the voyage is begun, the Carrier shall nevertheless be entitled in respect thereof to all liberties or exemptions from liability provided in this Article or elsewhere in this passage contract.

The Carrier accepts no responsibility for disease contracted on board whether same be contagious or due to epidemic or otherwise.

(b) The Carrier shall be entitled to all limitations or exemption from liability provided in or authorized by Section 4281 to 4286 inclusive, and Section 4289 of the Revised Statutes of the United States and amendments thereto. The Carrier shall also be entitled to all limitations of or exemptions from liability including those accorded to the owners or chartered owners of vessels or to Carriers by any statute or rule of law for the time being in force in the United States or any other country or place whose laws shall be applicable. This passage contract shall not be deemed to be or give rise to a personal contract of the Carrier. Nothing in this passage contract, expressed or implied, shall be deemed to waive or operate to deprive the Carrier or lessen the benefits of any such limitations or exemptions.

(c) Every responsibility of the Carrier hereunder shall be limited to that period only whilst the Passenger and his baggage and other property are being transported over the Carrier's own Line to a port or place in such port as the Vessel may safely get. All other transportation or service (including railroad, automobile, air or other shore transportation, transportation by tender or vessel not belonging to or operated by the Carrier, shore excursions, shore hotel or restaurant accommodations and services) shall be at the risk of the Passenger and the Carrier shall be under no responsibility in connection therewith and any money received by the Carrier or by any of its employees in respect of any such transportation or services is received only as the Passenger's agent to pay the same over to those furnishing such transportation or service.

The Carrier does not undertake to transport the Passenger or his baggage between the anchorage and landing in cases where landing is not made by the Vessel, and such transportation shall be paid for by the Passenger.

(d) If the Vessel carries surgeon, physician, barber, hairdresser, manicurist, or other personal service personnel, that is done solely for the convenience of Passengers and any such person in dealing with a Passenger shall not be considered in any respect as the servant or agent of the Carrier and the Carrier shall not be liable for any act or omission of such person or of those under his or her orders, or assisting him or her with respect to treatment, advice, care or service of any kind given to any Passenger. The surgeon, physician, barber, hairdresser or manicurist, or other personal service personnel, shall be entitled to make a proper charge subject to the approval of the Master for any service performed with respect to a Passenger and the Carrier shall not be concerned otherwise in any way whatsoever in any such arrangement. The Carrier shall not be under any obligation to provide the Passenger with facilities for medical treatment or care in any case until the Master has received notice from the Passenger, which shall be in writing, if possible, that medical treatment or care is required and the Carrier shall have had an opportunity to provide such facilities.

(e) Any Passenger visiting or using any athletic or recreational apparatus, equipment or space, does so at this own risk of injury, damage or loss to person or property.

(f) Notwithstanding anything to the contrary contained herein in the event of any claim for loss of life or bodily injury or any claim arising thereby or of any other claim whatsoever except as to those matters covered in Article 11 hereof, arising from any cause whatsoever for which the Company may be liable, the damages recoverable by the Passenger or his or her surviving spouse or anyone claiming any right or recovery either directly or indirectly or by or on behalf of another, shall not exceed $ 5000.00 provided however, that in no event shall the recovery exceed the actual amount of damages sustained. Dollars in this contract refer to currency of the United States of America. By accepting or receiving this passenger ticket each Passenger agrees without prejudice to its other provisions and both on his or her behalf and on behalf of any person or child travelling with him or her or in his or her care that all rights, exemptions from liability, defences and immunities of whatsoever nature referred to in this ticket applicable to the Company (which term shall for the purpose of this clause include the Shipowners, the Line, Charterers, Managers, Operators and the Ship, as the case may be) shall in all respects ensure also for the benefit of any servants or agents of the Company acting in the course of or in connection with their employment so that in no circumstances shall any servant or agent as the result of so acting be under any liability to any such Passenger or to any such person or child greater than or different from that of the Company. For the purpose of the agreement contained in this clause, the Company is or shall be deemed to be acting on behalf and for the benefit of all persons who are or may be its servants or agents from time to time and all such persons shall to this extent be or be deemed to be parties to the contract contained or evidenced in this ticket.

In addition to General Conditions and Carrier Notices call at any port will be subject to weather conditions without any right of refund in case any call or calls are omitted.

**13)** Notwithstanding anything to the contrary contained herein, any action against the Carrier must be brought only before the courts of Athens Greece to the jurisdiction of which the Passenger submits himself formally excluding the jurisdiction of all and other court or courts of any other country or countries which court or courts otherwise would have been competent to deal with such action.

The Carrier shall not be liable for any claim whatsoever of the passenger or his or her surviving spouse, executors, administrator, legal representatives, heirs, assigns, next of kin, dependents or personal representatives and howsoever and wheresoever occurring unless written notice thereof with full particulars shall be lodged with the Carrier or its agents as follows:

(a) within six (6) months from the day when death or injury occurred in respect of any claims for loss of life or bodily injury in any case where Section 4282 A of the Revised Statutes of the United States shall apply;

(b) Within two (2) months after the death of the Passenger when occurring before landing or when occurring within fifteen (15) days after landing or the abandonment or breaking up the voyage in respect of any claim for loss of life, except where said Section 4282 A shall apply.

(c) Within fifteen (15) days after the Passenger shall be landed or the voyage is abandoned or broken up, in respect of any claim whatsoever unless such claim is included within sub-paragraphs (a) and (b) of this Article. Suit to recover on any claim shall not be maintainable unless commenced and process served as follows:

(1) Within one (1) year from date when the death or injury occurred in respect of any claim for loss of life or bodily injury in any case where said Section 4282 A shall apply.

(2) Within six (6) months after the Passenger shall be landed from the Vessel or the voyage shall be abandoned or broken up after the death of the Passenger when occurring before landing whichever may be the case in respect of any claim whatsoever unless such claim is included within category (1) just mentioned.

Action or negotiations by the Carrier or its agents or attorneys shall not be deemed a waiver of the provisions of this Article, whether such actions or negotiations are before or after the time limitations herein set forth, nor shall any express waiver of such time limitations be effective unless made in writing by a duly authorized officer or director of the Carrier

**14)** The Carrier may, with or without notice, and before, at, or after the commencement of the voyage, abandon or cancel the voyage, delay or advance the scheduled times of sailing or arrival, withdraw the Vessel from service, discontinue service between any ports, omit or change any port or ports of call, deviate from the scheduled voyage, change accommodations or substitute another vessel or require the Passenger to leave the Vessel temporarily. In any such event, and whether before or after embarking, the Carrier shall not be liable to the Passenger for any expenses incurred by the Passenger thereby for hotel or board bills, travelling expenses or any other expense or for loss or damage or otherwise occasioned thereby, directly or indirectly, Carrier may at its option, arrange for substantially equivalent transportation by another Carrier and/or by other means of transportation at the sole risk of the Passenger and such carriage shall be under and subject to the passage contract of such substituted Carrier

In the event accommodations are changed as provided in this Article, Passengers will pay or receive, as the case may be, the difference in rate, if any, between the accommodations originally reserved or assigned and the substitute accommodations furnished to the Passenger.

**15)** The terms of this passage contract shall be separable and the illegality or invalidity of any article, paragraph, clause, or provision of this passage contract in whole or in part shall not affect or invalidate any other article, paragraph, clause or provision thereof

**16)** THE PASSENGER AND, IF ANOTHER, THE PURCHASER HEREOF CONVENANT AND WARRANT THAT HE OR THEY ARE DULY AUTHORIZED ON BEHALF OF ALL OF THE PASSENGERS NAMED HEREIN TO AGREE TO AND ARE BOUND BY ALL OF THE STIPULATIONS, TERMS, CONDITIONS, EXEMPTIONS AND EXCEPTIONS HEREIN CONTAINED IN EVERY CONTINGENCY WHATSOEVER AND WHERESOEVER OCCURRING AND EVEN IN THE EVENT OF OR DURING DEVIATION OR UNSEAWORTHINESS OF THE VESSEL AT THE INCEPTION OF THE VOYAGE OR SUBSEQUENTLY. The passenger admits having read this passage contract and agrees that its provisions constitute the complete agreement between the Carrier and said Passenger.

The Passenger and, if another, the purchaser further warrants that he knows the name of the owner and/or demise charterer of the Vessel and waives any disclosure of the name of the owner or of the demise charterer.

SUN LINE GREECE SPECIAL SHIPPING CO Inc - Operator and Carrier